[Cite as *In re A.S.*, 2012-Ohio-3197.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

IN THE MATTER OF:

    A.S.                                    CASE NO.  1-12-01

ADJUDICATED DEPENDENT CHILD,

                                           O P I N I O N

[JENNIFER ALEXANDER -
    APPELLANT].

IN THE MATTER OF:

    M.M.                                   CASE NO.  1-12-02

ADJUDICATED DEPENDENT CHILD,

                                         O P I N I O N

[JENNIFER ALEXANDER -
    APPELLANT].

Appeals from Allen County Common Pleas Court
Juvenile Division
Trial Court Nos. 2010JG27309 and 2010JG27310

Judgments Affirmed

Date of Decision:  July 16, 2012

Case Nos. 1-12-01 and 1-12-032

**APPEARANCES:**

*Sarah N. Newland* for Appellant/Mother

*Mariah M. Cunningham* for Appellee, Allen Co. Children's Services

**Keith Schierloh** for Appellee/Father

*Marie A. Von der Embse* for Appellees/Minor Children

**SHAW, P.J.**

{¶1} Mother-appellant Jennifer Alexander ("Jennifer") appeals the December 20, 2011 judgment of the Allen County Court of Common Pleas, Juvenile Division, awarding permanent custody of her two minor children, A.S. and M.M., to the Allen County Children's Services Board (hereinafter "ACCSB" or "the agency").

{¶2} The facts relevant to this appeal are as follows. Jennifer is the mother of A.S., born August, 2008, and M.M., born October, 2009. David Thompson was determined to be the father of the two children.

{¶3} On January 17, 2010 an incident occurred wherein M.M., not yet three months old, was in a baby swing crying. Jennifer kicked the baby swing holding M.M., nearly toppling the swing, and Jennifer threatened to shake M.M. Jennifer's sister Stacy attempted to intervene to protect M.M. and when Stacy did

intervene, Jennifer assaulted Stacy and threatened to kill her. Jennifer's other child A.S., who was one year old, was present at the time of the incident. As a result of the incident, the police were called and Jennifer was arrested for domestic violence.

{¶4} Following the incident, on January 29, 2010, Allen County Children Services Board filed two complaints. The first complaint alleged that A.S. was a dependent child and the second complaint alleged that M.M. was a dependent and neglected child. (Doc. 2, 2).[1]

{¶5} On February 2, 2010, in order to protect the best interests of the children, Marie Von der Embse was appointed as Guardian Ad Litem ("GAL") for the two children. (Doc. 7, 8).

{¶6} On February 3, 2010, a "shelter care" hearing was held. Despite being notified of the hearing, Jennifer did not attend. From the testimony presented at the hearing the magistrate found that Jennifer refused to cooperate with the ACCSB caseworker and at times would not even talk to her. (Docs. 13, 15). Further, the magistrate found that Jennifer refused to approve a safety plan proposed by the agency and that Jennifer missed a meeting at the agency. (*Id.*) On February 4, 2010, pursuant to the magistrate's order, both A.S. and M.M. were placed in the shelter care of ACCSB. (*Id.*) A.S. and M.M. were subsequently

---

[1] The first document number in the series cited here and afterward throughout this opinion corresponds to the case file pertaining to A.S. and the second document number corresponds to the case file pertaining to M.M.

placed in the foster home of Danielle Kohler ("Kohler"), where the children have since remained.

{¶7} On February 26, 2010, a case plan was filed. (Doc. 18, 22). As part of the case plan Jennifer was required to complete a mental health assessment and follow recommendations, complete agency approved parenting classes, complete random urine screens, provide for the children's basic needs, complete an assessment for anger management services, have no unsupervised contact with her daughters, have no further incidents of domestic violence, and work with Help Me Grow services. (*Id*.)

{¶8} On March 10, 2010 a hearing was held on the agency's complaints to determine whether A.S. was dependent and to determine whether M.M. was dependent and neglected. Despite being notified of the hearing, Jennifer did not attend. At the hearing, testimony was provided by investigative caseworker Sharon Fenton of ACCSB and Officer Trent Kunkleman who was the responding officer for the domestic violence incident wherein Jennifer kicked the baby swing holding M.M.

{¶9} On March 12, 2010, the magistrate's decisions were issued finding both A.S. and M.M. dependent pursuant to R.C. 2151.04. (Docs. 23, 24) M.M. was not found neglected. (*Id*.)

{¶10} On April 16, 2010, the trial court adopted the findings of fact and conclusions of law contained in the magistrate's decisions finding that A.S. and M.M. were dependent children. (Docs. 27, 31). Further, the trial court found that there was reasonable cause for issuance of the shelter care order previously filed, and that reasonable efforts had been made by ACCSB to "eliminate continued removal of the minor child[ren] from the home." (*Id.*)

{¶11} On April 26, 2010 the trial court adopted the findings of the magistrate placing the children in the temporary custody of ACCSB and the February 26, 2010 case plan was made the order of the court. (Docs. 38, 30).

{¶12} On December 28, 2010, ACCSB filed motions to extend temporary custody of A.S. and M.M. (Docs. 30, 34). On March 14, 2011, a hearing was held on the motion to extend temporary custody. On March 16, 2011, the magistrate issued a decision extending temporary custody. (Docs. 40, 45). In that decision, the magistrate found that Jennifer was released from incarceration in Marysville in October of 2010, that Jennifer had failed to take all required random urine screens, and that Jennifer was not visiting the children consistently. (*Id.*) Therefore temporary custody was extended "because the mother was incarcerated and needs additional time to complete case plan services." (*Id.*) On May 25, 2011, the magistrate's decision was adopted by the trial court, extending temporary custody for an additional six month period. (Docs. 41, 47).

{¶13} On June 22, 2011, ACCSB filed motions requesting permanent custody for A.S. and M.M. (Docs. 43, 49).

{¶14} On November 29, 2011, Jennifer filed motions for legal custody of A.S. and M.M. On December 6, 2011, Jennifer filed amended motions for legal custody, requesting legal custody *or*, in the alternative, temporary custody of A.S. and M.M.

{¶15} On December 1, 2011, the GAL filed a report and recommendation regarding A.S. and M.M., recommending that ACCSB be granted permanent custody of both of the children. (Docs. 76, 76).

{¶16} On December 7, 2011, the hearing on ACCSB's permanent custody motion and Jennifer's custody motions was held. At the hearing ACCSB first called Judy Lester, a SAFY Behavioral Services therapist. Lester testified that A.S. has a "sensory integration disorder" which causes abnormal melt downs and that A.S. "has difficulties with sensory information coming into her brain." (Tr. at 6). Lester testified that A.S. would need special care and because of this, Lester testified, A.S. needs an adult to be well regulated. (Tr. at 10, 14).

{¶17} Next, Danielle Kohler, the foster mother, testified that she had been a licensed foster parent for 6 years, that she had taken care of A.S. and M.M. for roughly 22 months, and that she desired to adopt the two children. (Tr. at 30, 54-55). Kohler testified to the difficulties in dealing with A.S.'s sensory disorder,

stating that A.S. has to see multiple doctors and that A.S. needs a structured environment. (Tr. at 33-35). Kohler testified that she carries a binder with her at all times to help her deal with A.S.'s disorder. (Tr. at 33). Kohler further testified to a typical day involving A.S., which includes listening therapy, and brushing therapy[2], and on some days, trips to the occupational therapist in Toledo. (Tr. at 38-40). Kohler testified that she had talked about these things with Jennifer and had showed Jennifer the "brushing" technique, but Kohler said she was "not sure that [Jennifer] understood." (Tr. at 43). Kohler further testified that she sees similar problems to A.S. developing in M.M., though M.M. has not been diagnosed with a sensory disorder. (Tr. at 44-45).

{¶18} Kohler testified that A.S. and M.M. were integrated into her home and that they were effectively "siblings" with the other children. (Tr. at 52). Finally, Kohler testified to one incident where Jennifer cancelled an agency visit and Jennifer said to Kohler via text message that "she couldn't do it anymore." (Tr. at 47).

{¶19} Amber Martin, the caseworker from ACCSB, testified at the hearing that although Jennifer had complied with some parts of the case plan, she had not fulfilled it. Martin testified that Jennifer was required to complete a mental health assessment and comply with any recommendations from that assessment. (Tr. at

---

[2] According to Kohler, brushing therapy is done on A.S. every two hours and encompasses using a "surgical brush" to "brush her arms, legs, her back in the specific order, and specific way. And then you do joint compressions on her hips, knees, ankles, shoulders, elbows and wrists." (Tr. at 36).

-7-

71). Martin testified that Jennifer completed the assessment and it was recommended that Jennifer undertake Moral Recognition Therapy, which Jennifer completed. However, Martin expressed concerns that after going through the class, Jennifer was arrested for, and convicted of, theft from her employer Little Caesars.

{¶20} Martin testified that Jennifer completed some of the urine screens she was required to take, though Jennifer only took 8 of the 21 screens, passing those that she took. (Tr. at 73). Martin testified that for the majority of the tests Jennifer failed to take, Jennifer gave no reasons why she did not take them, but when Jennifer did give reasons she said that she had "lost the mail, the piece of paper. She didn't have transportation and forgot." (Tr. at 75).

{¶21} Martin further testified that during the pendency of these proceedings Jennifer was incarcerated twice, the first time being from February 2010 until October 2010, and the second time being from October 2011 until November of 2011.[3] (Tr. at 76).

{¶22} Martin then testified that there were concerns with Jennifer being able to provide for the basic needs of the children. (Tr. at 78). These concerns included the fact that Jennifer had not maintained a residence, moving nine times

---

[3] Martin testified that she believed the first incarceration was due to a parole violation based on the domestic violence incident. Cross examination by Jennifer's attorney seems to imply that Jennifer was convicted of Persistent Disorderly Conduct out of the earlier incident of domestic violence. According to Martin, the second period of incarceration resulted from Jennifer's theft from Little Caesars.

throughout these proceedings.[4] Martin testified that shortly before the final hearing, Jennifer had taken Martin to an apartment Jennifer claimed she would be renting, but the apartment was empty and no lease had been signed up to the time of the hearing. (Tr. at 83). Martin also testified that Jennifer's current boyfriend and the father to her unborn child, Todd Wilson, was planning to live with her at the new residence. (Tr. at 145). Martin testified that the agency had received reports of domestic violence between Todd Wilson and Jennifer. (*Id*.)

{¶23} Martin testified that Jennifer did not show the ability to meet her own financial needs as she had only been employed for about three weeks at Little Caesars since April of 2010. Martin also testified that Jennifer exercised her supervised visitation times inconsistently in "spurts." (Tr. at 89). According to Martin, Jennifer was late or missed twenty-six visits with the children in a fourteen month period. (*Id*. at 90). Martin testified that Jennifer's reasons for missing or being late included, "[s]lept in, sick has been several times, one time she was having her taxes done, a train one time made her late." (Tr. at 90). Martin testified that after a period of weeks where Jennifer missed visitation, A.S. was hesitant to go back and she "saw an increase of behaviors [of A.S.] into visitation, pulling out hair, biting, acting out after visits." (Tr. at 91).

---

[4] Some of these moves were back and forth to various correctional institutions and back and forth to her father's home. Martin testified that in one apartment that Jennifer resided in, her electric was turned off for failure to pay the bill. (Tr. at 85).

**{¶24}** In conclusion, Martin testified that she did not believe A.S. or M.M. could be placed with Jennifer within a reasonable time, stating "[a]t this time, [Jennifer] still does not have a home, a lease, income is still unknown, there is not a regular income. There is still some inconsistency with visitation and [A.S.]'s needs level has increased * * *[.]" (Tr. at 103). ACCSB then rested its case.

**{¶25}** Jennifer then testified at the hearing, arguing that she should get legal custody of A.S. and M.M., or in the alternative, temporary custody of the two children. Jennifer testified that she had verbally agreed to rent an apartment but had not signed a lease yet. (Tr. at 148). Jennifer also testified that she was attempting to get financial assistance through the State. (Tr. at 150). Jennifer testified that she was pregnant by her boyfriend Todd and looking for a job. (Tr. at 172). Jennifer also testified that her boyfriend Todd had been convicted of two counts of Drug Trafficking, and Jennifer testified she was aware that Todd had been convicted of two counts of domestic violence. (Tr. at 174).

**{¶26}** After Jennifer testified, David Thompson, the father of the two children testified. Thompson testified he had only seen A.S. once and had never seen M.M. According to the GAL report, Thompson had 10 kids and did not want to, or have the means to, take custody of the two children.

{¶27} Following Thompson's testimony, the GAL made a statement in closing arguing for permanent custody to be awarded to ACCSB. After closing arguments, the case was submitted for the court's decision.

{¶28} On December 20, 2011, two judgment entries were filed awarding permanent custody to ACCSB for both A.S. and M.M. The court found in separate judgment entries for each child that each child could not be placed with either parent within a reasonable period of time and that the children had been in the temporary custody of ACCSB for twelve or more months of a consecutive twenty-two month period. (Docs. 81, 79). The court found that the children were in need of legally secure permanent placement and that they had been fully integrated into the Kohler foster home. (*Id.*) The court found upon consideration of the factors enumerated in R.C. 2141.414 that an award of permanent custody to ACCSB was in the children's best interests. (*Id.*)

{¶29} It is from the December 21, 2011 judgment entries that Jennifer appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE TRIAL COURT ERRED IN FINDING THAT THE MINOR CHILDREN COULD NOT BE RETURNED TO MOTHER WITHIN A REASONABLE TIME PURSUANT TO R.C. 2151.414(E).**

**ASSIGNMENT OF ERROR 2**
**THE TRIAL COURT ERRED IN FINDING THAT IT WAS IN THE CHILDREN'S BEST INTEREST TO TERMINATE THE**

**MOTHER'S PARENTAL RIGHTS AND PLACE THE CHILDREN IN THE PERMANENT CUSTODY OF THE ALLEN COUNTY CHILDREN SERVICES BOARD.**

**ASSIGNMENT OF ERROR 3**
**THE TRIAL COURT ERRED IN FINDING THE MINOR CHILDREN DEPENDENT AS DEFINED IN R.C. 2151.04(B) AS THIS WAS NOT ALLEGED IN THE COMPLAINT FILED BY THE ALLEN COUNTY CHILDREN SERVICES BOARD.**

*First Assignment of Error*

**{¶30}** In Jennifer's first assignment of error, she argues that the trial court erred in finding that the children could not be returned to Jennifer within a reasonable time. Specifically Jennifer claims, *inter alia*, that she was in the process of acquiring an apartment and securing funds to support A.S. and M.M.

**{¶31}** As an initial matter, we note that "[i]t is well recognized that the right to raise a child is an 'essential' and 'basic' civil right." *In re Franklin*, 3d Dist. Nos. 9-06-12, 9-06-13, 2006-Ohio-4841, ¶ 9, citing *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). The Supreme Court of Ohio has held that a parent "must be afforded every procedural and substantive protection the law allows." *In re Hayes, supra*, quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991) Thus, it is with these constructs in mind that we proceed to determine whether the trial court erred in granting permanent custody of the children to the agency.

**{¶32}** Section 2151.414(B)(1) of the Revised Code provides, *inter alia*, that a trial court

**may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**

**(a)   The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**

**(b)   The child is abandoned.**

**(c)   The child is orphaned, and there are no relatives of the child who are able to take permanent custody.**

**(d)   The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and * * * the child was previously in the temporary custody of an equivalent agency in another state.**

R.C. 2151.414(B)(1)(a-d).

{¶33} The Supreme Court of Ohio has held that "[c]lear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). Further, "[i]t is intermediate; being more than a mere preponderance, but not to the extent of such

certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Id.,* citing *Merrick v. Ditzler*, 91 Ohio St. 256 (1915). In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross, supra* (citations omitted); *see, also, In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985).

{¶34} At the outset, we note that Jennifer does not dispute the finding of the trial court that the children have been in the agency's temporary custody in excess of the required twelve or more months in a consecutive twenty-two-month period, which would satisfy R.C. 2151.414(B)(1)(d).[5] Pursuant to the plain language of R.C. 2151.414(B)(1)(d), when a child has been in an agency's temporary custody for twelve or more months of a consecutive twenty-two month period, a trial court need not find that the child cannot or should not be placed with either parent within a reasonable time. *See* R.C. 2151.414(B)(1)(d). Therefore, the court was not required to go into a "reasonable time" analysis as alleged in Jennifer's appeal as R.C. 2951.414(B)(1)(d) was satisfied.

{¶35} However, the court made the additional finding that the children could not be placed with either parent within a reasonable time or should not be

---

[5] Jennifer's brief, in the "Statement of Facts" specifically reads "[t]he minor children resided with the same foster family for approximately twenty-two months." (Appt. Br. at 3).

-14-

placed with either parent. R.C. 2151.414(B)(1)(a). The assignment of error raised is related to this additional finding by the trial court, therefore, in the interest of justice we will address the argument made regarding the adequacy of that specific finding.

**{¶36}** In regards to making a finding pursuant to R.C. 2151.414(B)(1)(a) that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent, the Revised Code states:

> **(E) In determining at a hearing held pursuant to division (A) of this section \* \* \* whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section \* \* \*** *that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:*
>
> **(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**
>
> \* \* \*

-15-

**(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;**

\* \* \*

**(10) The parent has abandoned the child.**

\* \* \*

**(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.**

(Emphasis Added.) R.C. 2151.414(E)(1, 4, 10, 14).

**{¶37}** In addressing the factors in R.C. 2151.414(E), the trial court held the following in both judgment entries related to A.S. and M.M.:

> [T]he child cannot be placed with either parent within a reasonable period of time and should not be placed with the parents. Further, the court finds that following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, both parents failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home (O.R.C. 2151.414(E)(1)). Further, the mother and father have both demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so and by their other actions showing an unwillingness to provide an adequate, permanent home for the child (O.R.C. 2151.414(E)(4)). Further, the father has abandoned the child. (O.R.C. 2151.414(E)(10). Both the mother

> **and the father have been unwilling to provide food, clothing, shelter and other basic necessities for the child. (O.R.C. 2151.414(E)(14)).**

(Doc. No. 81, 79).

{¶38} Jennifer challenges these findings of the trial court, arguing that she had complied with parts of the case plan by taking recommended classes and taking some drug screens. Jennifer also argues that she had applied for assistance from Job and Family Services and would be receiving $435.00 a month in cash assistance and $200.00 a month in food stamps. Further, Jennifer argues she was in the process of getting an apartment.

{¶39} While it is true that Jennifer did follow through with some of the case plan, the evidence would support the trial court's finding that she had not "substantially" remedied the problems that led to the children's removal. The only job Jennifer had during the pendency of these matters was a three-week stint at Little Caesars from which she was apparently fired after stealing from the store. Moreover, Jennifer's arguments regarding the apartment and the cash assistance are completely speculative. Jennifer had ample time prior to the final hearing to get a job and/or cash assistance and secure a place to live. However, Jennifer was only in the process of doing these things with no proof at the hearing that she would be getting cash assistance to provide for the kids or that she had signed a lease for the apartment.

{¶40} Furthermore, Jennifer planned on moving in with the father of her unborn child, Todd Wilson, who had two prior domestic violence convictions and had also been convicted of drug trafficking. Finally, Jennifer only took 8 of 21 drug screens, and was late to or missed entirely, 26 visits with her children. Throughout the time since A.S. and M.M. had been taken from Jennifer, Jennifer had been in and out of incarceration and she did not attend many of the hearings in this case despite being notified.

{¶41} Although Jennifer claims that the children could be returned to her within a reasonable time, she has produced no concrete evidence of her ability to support the children, relying instead on speculative money and claims that Jennifer's father and/or boyfriend would assist her. Based on the record, we find that there was clear and convincing evidence to support the finding of the trial court. Accordingly, Jennifer's first assignment of error is overruled.

*Second Assignment of Error*

{¶42} In Jennifer's second assignment of error, she argues that the trial court erred in finding that it was in the children's best interests that permanent custody was awarded to ACCSB. Specifically, Jennifer argues that the trial court's finding that the children would be returning to a "virtual stranger" if they were returned to their mother was improper.

**{¶43}** When determining whether granting permanent custody to the agency is in the best interest of the child, the court must consider all of the relevant factors listed in R.C. 2151.414(D)(1), including:

> **(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**
>
> **(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**
>
> **(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period * * *;**
>
> **(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**
>
> **(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

**{¶44}** After considering the factors in R.C. 2151.414(D), the trial court found that "an award of permanent custody to the Allen County Children Services Board [was] in the child[ren]'s best interest. (Docs. 81, 79).

**{¶45}** In regards to factor (a), at the final hearing, testimony presented established that Jennifer was late to or missed 26 appointments with her children. (Tr. at 90). Testimony also established that the inconsistency furthered difficulties with A.S.'s behaviors and disorder. (Tr. at 11, 91). Evidence was presented at the

-19-

hearing that A.S. and M.M. were fully integrated into the foster caregivers' family, in which both children had resided together for the majority of their lives. (Tr. at 52-54, 105-106). Testimony established that the children had been with the foster family for 22 months, the majority of the children's lives.

{¶46} In regards to factor (b), the children's wishes were expressed through the GAL. The GAL visited with the children and spoke to several family members. Based on her investigation, the GAL determined that the best interests of A.S. and M.M. would be served by granting permanent custody to ACCSB.

{¶47} In regards to factor (c), as stated above, A.S. and M.M. had been in ACCSB's custody for more than twelve months of a twenty-two month consecutive period at the time ACCSB filed the motions requesting permanent custody.

{¶48} In regards to factor (d), Jennifer had been in and out of jail, had moved nine times, had no job, had no income, had no place of residence and was preparing to move in with a man with a substantial criminal record. Jennifer did not provide any documentation that could support her ability to provide for the children. On the contrary, the children's foster mother, Danielle Kohler, had expressed interest in adopting both A.S. and M.M.

{¶49} In regards to factor (e), none of those factors are applicable to this situation.[6]

{¶50} Based on the foregoing we find that there was clear and convincing evidence to support the decision made by the trial court that it was in the children's best interest for permanent custody to be awarded to ACCSB. Accordingly Jennifer's second assignment of error is overruled.

*Third Assignment of Error*

{¶51} In Jennifer's third assignment of error, she argues that the trial court erred in finding the minor children dependent in the original adjudicatory hearing pursuant to R.C. 2151.04(B) when, she claims, such an allegation was not contained in the complaint. Specifically Jennifer argues that the complaints claimed that A.S. and M.M. were dependent pursuant to R.C. 2151.04(C) rather than R.C. 2151.04(B) as they were found by the magistrate and the trial court. We find that Jennifer's argument is barred by the doctrine of *res judicata*.

{¶52} The doctrine of *res judicata* has two aspects: claim preclusion and issue preclusion. *Grava v. Parkman Twp.*, 73 Ohio St.3d 379, 381, 1995-Ohio-331. As to the claim preclusion aspect, this doctrine provides that an existing, final judgment between the parties to litigation bars all claims which were litigated *or could have been litigated* in that lawsuit from being relitigated in a later action.

---

[6] Factor (e)(10) would be relevant to the father as the court found the father had abandoned the children. However, this appeal pertains to the mother's rights, so we decline to address this issue.

*Grava*, *supra*, at 381. This doctrine has been held to apply to appellate proceedings in both criminal and civil cases.

**{¶53}** In the present case, when A.S. and M.M. were adjudicated as dependent children by the magistrate, no objection was made to the magistrate's decision. The magistrate's decision was later adopted by the trial court, and the specific findings of dependency related to each child were made the order of the court. No appeal was ever taken from that judgment. The parties then proceeded to the permanent custody hearing. The appeal in this case is taken from the December 20, 2011 judgment entry awarding permanent custody to ACCSB. Under the doctrine of *res judicata*, Jennifer cannot now claim the magistrate's finding of dependency in the original adjudicatory hearing, and the trial court's adoption of it, as error on appeal. *See In re S.J.*, 9th Dist. No. 23199, 2006-Ohio-6381 ¶¶ 14-17. Accordingly, Jennifer's third assignment of error is overruled.

**{¶54}** For the foregoing reasons Jennifer's assignments of error are overruled and the judgments of the Allen County Court of Common Pleas, Juvenile Division, are affirmed.

***Judgment Affirmed***

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**